Borel.Sent.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,      .   No. 97-091(JAF)
                               .
        Plaintiff,             .   Hato Rey, Puerto Rico
                               .   November 10, 1999
                               .
        v.                     .
                               .
ARMANDO BOREL BARREIRO,        .
                               .
Defendant.                     .
. . . . . . . . . . . . . ./

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE JOSE ANTONIO FUSTE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:            MARIA DOMINGUEZ, AUSA
                               EDNA ROSARIO, AUSA
                               US Attorney's Office

For Defendant
Armando Borel:                 YOLANDA COLLAZO, ESQ.


DEFENDANT'S
EXHIBIT

Borel.Sent.


Court Reporter:                    Donna W. Dratwa, RMR, CR




2



1                    PROCEEDINGS

2                      - - -

3        THE COURT:  Let's call the next case.

4        THE CLERK:  Yes, Your Honor.  For sentence,

5    criminal 97-91, the United States of America versus

6    Armando Borel.

7        MS. COLLAZO:  Good afternoon.  On behalf of Armando

8    Borel, Yolanda Collazo.  And we're ready to proceed, sir.

9        THE COURT:  Well, Counsel, what objections remain

10   as to the presentence report of Mr. Borel?

11       MS. COLLAZO:  We have no objections to the

12   presentence report.  We believe that the probation

13   officer did an excellent job assessing all matters

Borel.Sent.

4    pertaining to the instant case and also to the pers
nal

5    factors of the defendant.  Just so, to the effect t
at in

6    the presentence report, he included my contention i

7    regards to having Mr. Borel responsible only for th

8    monies diverted from Octagon; that is, the amount o

9    $50,000.

20    And he also included the government's content
ion to

21    the effect that he was responsible for all the

22    transactions in which he participated, and the cond
uct of

23    others in the criminal activity that was reasonably

24    foreseeable for him.  According to the government,
he

25    should be made accountable for the amount of $695,0
00.

3

1    That amount, including $50,000 in checks signed by

2    Mr. Borel from Octagon, $240,000 from Medservices,
and

3    $374,000 from Fundacion Panamericana, and $31,000 f

It is our contention, Your Honor, that Mr. Bo

5
el
should only be held accountable for the monies that

6
were
diverted from Octagon. That was the only point tha

7
we
are in dispute. But in regards to the presentence,

8
we
believe that it was adequately assessed in all fact

9
ors.

10        THE COURT: Government?

11        MS. ROSARIO: We object to Ms. Collazo's argu
ment
that Mr. Borel should only be held accountable for

12
$50,000, which was the money from Octagon, based on

13
this
defendant was found guilty by a jury as a coconspir

14
ator
of the conspiracy charge in Count One.

15        We proffer to the Court that he would pick up

16
the
checks. We proffer to the Court that we have avai

17
able
Angel Corcino, who is in the witness room, who wou

18
d
testify, Your Honor, that when Yamil Kouri was not

19
in

Page 4

20      Puerto Rico, Armando Borel would pick up the
from

21      Fundaci¢n and Medservices and deliver them to Yamil

22      Kouri, which were monies that Your Honor knows were

23      diverted from ACHS.

24          We also proffer to the Court that Armando Bor
el's

25      participation in this conspiracy made him an activ

        4

1       participant of the diversion of funds, and that it
was

2       foreseeable the amount of loss that is charged in
he

3       indictment, as in the PSI.  Mr. Corcino is availal
e to

4       testify, should the Court want to hear his testim
y.

5          THE COURT:  Very well.  I don't want to mak
a

6       ruling on this adjustment yet.

7          Let me ask counsel, what do you have to say
n

8       behalf of your client?

9          MS. COLLAZO:  I believe that it was not fo:
eeable

for him, Your Honor, in regards to what the governm

contends, in regards to the part that they mentione to

2    the credibility of Corcino. I would join brother -
or

3    distinguished brother counsel Rebollo in regards to the

4    credibility of Mr. Corcino.

5          Being so, Your Honor, I believe that even the

6    jurors that sat on this case for three months and

7    assessed all the evidence that was set forth before them

8    made a distinction in regards to Mr. Borel, whereas they

19    acquitted him on Count Seven. So -- Your Honor was the

20    presiding judge in this case.

21          THE COURT: Which was -- Count Seven was

22    specifically which one?

23          MS. COLLAZO: Count Seven.

24          THE COURT: Which was?

25          MS. COLLAZO: The one that had to do with

5

1    Laboratory Especiales, some checks that were diverted.

2           MS. ROSARIO:  The count that charged the $50,000

3    count.

4           MS. COLLAZO:  No, I'm talking about the account

5    that --

6           MS. ROSARIO:  I stand corrected, Your Honor.

7           MS. COLLAZO:  I think the distinction should be

8    made, Your Honor, in regards to his participation versus

9    the other defendants in this case.  And I believe that

10   Your Honor being the presiding judge here, and carefully,

11   as always, assessing all the evidence that is brought

12   forth, is a person to adequately go over those matters,

13   Your Honor.

14          THE COURT:  Very well.  And what about the general

15   elocution.

16          MS. COLLAZO:  I would like to bring to the

17   attention of the Court, and above all, we move the

18   discretion and the authority of this Court in regards to

Page 7

Borel.Sent.

sentencing, Your Honor, as per the letters that for part

of the presentence report that you have before you, nd

that I also have a copy -- Mr. Borel has always bee a

law-abiding citizen.  He's always been a hard worke a

family man.  His family is composed of his 83-year- ld

mother, who is not in the best of health; his wife, who

at the present time is without a job; his son, who' a

6

senior in his fourth year of pre-med school, and wh ) this

coming year will enter medical school, in pursuit o f a

degree as a physician; that he has really suffered

greatly the results of the involvement in this case , and

that, as per the letters of the commendation, he ha s been

a hard worker, a dedicated husband, a dedicated son , and

Borel.Sent.

7       that I pray Your Honor will take all of those facto
rs in

8       consideration at the time of sentencing.

9            THE COURT:  Mr. Borel, I would really like to
hear

10       from you.  If you are so kind.

11          (Defendant speaks with the assistance of the

12          interpreter.)

13            THE DEFENDANT:  This is certainly difficult f
or me

14       to be here today before you.  I can say, Your Honor
, and

15       I can swear to you, by the most sacred thing, the t
hing

16       that I hold the dearest, which is my family -- my m
other,

17       my wife, and my son -- that I didn't take a single

18       dollar, a single penny.  I didn't steal anything, a
nd I

19       did not allow myself to be used for the stealing of
any

20       money.

21            Those checks that were signed by me were endo
rsed

22       to Food Service or Advanced Combo or Advanced Food
They

23       were never filled out by me.  I never knew the

24       destination of that money.  And I would like for yo
u to

Borel.Sent.

15      look into my heart, the pain that I have in my heart. I

7

1       did not steal anything.  And I can swear that before God,

2       my hand on a Bible.  That is the truth.

3           THE COURT:  Under what circumstances were those

4       checks prepared?  If you're so kind, would you tell me?

5       Who was to prepare the checks, and how did you come about

6       preparing those checks?

7           THE DEFENDANT:  The reason was that Mr. Eaves,

8       Mr. William Eaves, was not in Puerto Rico.  He had gone

9       back home to the United States, to his house, and I was

10      about to leave too, to go see my family -- which I did

11      once a month.  And in case there was a need to buy

12      anything, the checks were signed blank.  I never endorsed

13      any of them.

Borel.Sent.

14          THE COURT:  Who took the checks and signed them

15     blank, if you know?

16          THE DEFENDANT:  I gave those checks to Mr. Corcino,

17     with my signature, signed by me.  But I didn't fill them

18     out.  I didn't know of that corporation.  I didn't know

19     of the existence of that corporation.  I never went to

20     their offices.  I never went there.  I didn't even know

21     it existed.

22          THE COURT:  Did you at some point in time deliver

23     to anybody else checks at the request of Dr. Kouri or

24     anybody else?

25          THE DEFENDANT:  I never delivered anything to

8

1     anybody.  Mr. Kouri, Dr. Kouri would see me sporadically

2     whenever he would come and visit our offices, but he

3     never gave me any errands to run.

Page 11

Borel.Sent.

4          THE COURT:  I know that you had a right not to

5      testify, obviously.  Why wouldn't you testify and tell

6      the jury that this was so?

7          THE DEFENDANT:  Well, to tell you the truth, Your

8      Honor, that these events before this Court have been

9      terrible for me.  I have always sat here in awe and

10     completely afraid of all these proceedings.  These last

11     three years have been terrible for me.  Maybe you did not

12     see it in my face.  But every time I came here before

13     this court, before Your Honor, and before this jury, I

14     was deathly afraid of what was going to happen.

15          THE COURT:  Probation.

16     (Sidebar discussion had with the probation officer off

17     the record.)

18          THE COURT:  Would counsel please approach the bench

19     a minute.

20     (Sidebar conference had with all counsel and probation

Borel.Sent.

21        officer at bench off the record.

22        THE COURT:  I have asked for the gove
o

23        obtain a particular statement that apparently
orel

24        gave to the offices of the comptroller at the time
of

25        their investigation so I can take a look at it.
t me

9

1        take a short recess until the document is secured,
and

2        then we'll continue.

3            (Brief recess was had.)

4            THE COURT:  May I see the papers, please.

5            MS. ROSARIO:  Judge, the relevant questions h
ave

6        been highlighted.  I'm also providing to the Court
the

7        seven checks that are the subject of this transacti
on, in

8        the government's demonstrative chart.

9            (Documents handed to Court.)

10            THE COURT:  Will counsel please approach the
bench.

Page 13

Borel.Sent.

11          (Sidebar discussion had off the record.)

12          THE COURT:  Government, I will hear you

13      issue of elocution, and I will hear Mr. Borel again.

14          MS. DOMINGUEZ:  The government is not planning to

15      make any additional statement before the defendant was

16      sentenced, but in light of the representation that he has

17      made to the Court, I feel compelled to make a statement

18      so that the record accurately reflects the evidence

19      presented at trial in this case.

20          Number one, Judge, Mr. Borel has indicated to the

21      Court that he rarely saw Dr. Kouri.  His attempt to

22      distance himself from Dr. Kouri really is contradictory

23      to the bulk of the evidence that was presented at trial,

24      and I would remind the Court of the testimony of Suzette

25      Coretjer, William Eaves, Sonia Tolinche.

        10

Borel.Sent.

1         These are all people that said that Armando B
orel,

2     specifically with respect to Suzette and Eaves, the
y said

3     that Armando Borel really did nothing at Octagon; t
hat he

4     was, in everyone's perception, the eyes and ears of

5     Kouri.  Because at the times he would visit, he wou
ld

6     simply be trying to uncover information.  He had a
very

7     close relationship with Dr. Kouri.

8         Sonia Tolinche also went as far as describing
an

9     event where Mr. Borel had his ear to the door in an

10    attempt to hear what was transpiring in closed quar
ters.

11    There was testimony also that his position at ACHS
was

12    created.  It was a created position, because Yamil
Kouri

13    brought him to ACHS.

14        So his attempt to really distance himself fro
m

15    ACHS, I think, really is not supported by the evide
nce,

16    and the evidence has been that his relationship was

17    really with Yamil Kouri, not with Angel Corcino.

Borel.Sent.

18          Mr. Borel goes on to relay to the Court, in

19     specific response to the Court's questions regarding the

20     $50,000 Octagon transaction, and he stated to the Court

21     that he did not receive any money himself in that

22     transaction, which he is not necessarily accused of

23     doing, and is not necessary in order to find him a member

24     of the conspiracy here.

25          However, Judge, he made a pretty brief statement to

           11

1     the Court in which he essentially distances himself

2     totally from this transaction.  He said that he made the

3     checks payable to Advanced Food Service, and that it was

4     done as a matter of convenience in case checks were

5     needed for the legitimate business affairs of Octagon

6     during his absence and Mr. Eaves's absence.  And Judge,

7     that really is not the evidence in this case.

8          First of all, as the Court will recall, there

Borel.Sent.

were

9       two checks payable from Advanced Community Ser
to

10      Octagon Corporation, both issued on the same date,

11      September 24, 1992, both for the same amount   $25
,000

12      each, for a total of $50,000.  The court is well aw
are

13      these checks were endorsed, the testimony has been
by

14      Mr. Borel, and if the Court will compare the
ements

15      on these checks with the endorsements on the ones t
hat

16      Mr. Borel later cashed, it's the same handwriting.
You

17      don't have to be an expert in calligraphy to be abl
e to

18      discern that.

19           Now, Judge, after these checks were deposited
in

20      the Octagon account, within four days after that, s
even

21      temporary checks were written from the Octagon acco
unt.

22           Now, I would suggest to the Court,

23      Mr. Borel thought these were legitimate transaction
s,

24      what is the need to use temporary checks?  What was
the

Borel.Sent.

25      need to advise the president of the company, Willia
m

        12


1       Eaves, and the bookkeeper of the company who handle
d the

2       bookkeeping for the corporation, Suzette Coretjer,
that

3       this was being done.  Seven checks are issued betwe
en

4       September 28 and October 1 of 1992, totaling $50,00
0,

5       Judge.  Four of those checks, which Mr. Borel

6       conveniently told the Court about were in fact made

7       payable to Advanced Food Service, and those checks
have

8       been in evidence.  But what Mr. Borel has neglected
to

9       mention, three of those checks were payable to hims
elf

10      and endorsed and cashed by himself.  He did not mak
e

11      reference to that.

12          In my questioning of Ms. Collazo, where I poi
nted

13      out those checks after Mr. Borel's elocution, appar
ently

Borel.Sent.

14      she represents that he claims to have given this mo ney to

15      Angel Corcino.

16          And I would suggest to the Court that when so meone

17      is misrepresenting, he's got to have a very good me mory,

18      because Mr. Borel made a statement to the agents in this

19      case and to representatives from the comptroller's office

20      in February of 1997, where essentially, Judge, he c laims

21      that those checks were cashed for the purpose of bu ying

22      medical equipment, and he could not recall medical

23      equipment he had bought with $18,000 of ACHS's mone y.

24      But that is the essence of the statement that he ga ve to

25      the authorities, Judge.

        13

1           MS. COLLAZO:  Your Honor, I ask that he clari fy to

2       the questions posed by Your Honor.

Page 19

Borel.Sent.

3       THE COURT:  He can clarify the issues of the
e

4       checks that Ms. Dominguez has explained.

5       THE DEFENDANT:  I am a little more at ease now
w,

6       Your Honor.  Allow me to explain.

7       I received two checks in the amount of $75.00
0

8       each, and I was told to deposit this in the Octagon

9       account, which I did.  And in regards to these two

10      checks, that was the only thing that I did when I
m.  I

11      went to the bank and deposited them.

12      Several years later, when the officers came t
o my

13      house and they knocked on my door and they introduc
ed

14      themselves and they started asking me questions, af
ter so

15      long a period of time, there are many things that y
ou can

16      remember, and what I was told in regards to these f
unds

17      was that the money was for the purchase of equipmen
t,

18      medication, and supplies.

19      But I never received any information that thi
s

20      money was going to be given any improper use, becau

Page 20

Borel.Sent.

se if

21      I had, I would not have cashed them.  I told

22      something awhile ago, which I will now repe
ashed

23      these checks, and I turned over that money to Mr  A
ngel

24      Corcino personally, and that is the truth.  I never

25      turned over anything else to anyone else.  And I ca
n

14

1       swear that to you, Your Honor, once again, before t
he

2       Bible, before God, however you would like.  I never
did

3       anything of this.

4              And in relation to these ones, like I comment
ed

5       awhile ago, I was leaving on a trip, and I signed t
hem

6       and I turned them over.  All they had was the signa
ture.

7       And as you can observe, the checks were p        t by
a

8       typewriter, and that same typewriter was the one us
ed for

9       preparing the invoices.  You can verify that very

Page 21

Borel.Sent.

10    carefully.  I didn't fill these out.

11         But that same typewriter that was used for

12    preparing these checks and the invoices is the same

13    typewriter that was used for the preparation of countless

14    invoices, and that is the typewriter that I never had any

15    access to.  Because once more, I repeat, I never had

16    access to that office.  There were invoices from other

17    institutions for which this company rendered services

18    for.  Therefore, I count have filled them out, and i

19    never learned what the destination was of these funds,

20    and neither did I know the amounts that the checks were

21    made out to.

22         Your Honor, every time I would cash one of these

23    checks, I would go to Mr. Corcino's office.  I would turn

24    the money in to him like a normal business operation.

25    And you must remember that this institution was the

Borel.Sent.

1   institution from which the institute would purchase
the

2   products, but the institution itself had its person
nel

3   intermingled with the personnel from the institute.
It

4   was the same people.

5       But I never kept a single penny out of this,
and I

6   never allowed myself to be used by knowing that thi
s

7   money was going to be used for doing this or the ot
her.

8   I was never aware of any of this.

9       If you could call it that, Your Honor, I was
taken

10  advantage of, Your Honor, without my consent and wi
thout

11  my knowledge.  I don't know exactly by who or how,
but I

12  was.

13      THE COURT:  Did you ever receive checks or mo
nies

14  from Mr. Corcino for Dr. Kouri?

15      THE DEFENDANT:  Never.  I never took anything
I

Borel.Sent.

16    mean, never was I told, "Listen, go and take this c
ver to

17    Kouri", not checks, not cash, never.

18        If you were to tell me, "Hey, listen, could y
ou

19    take this envelope over to Ms. Sotomayor's office a
s a

20    favor," might have done something like that.  But k
nowing

21    the contents of it, never.

22        And I just mention the name Sotomayor out of

23    mentioning a single name, but as an example.  But I
never

24    worked as a messenger, as an errand boy for anyone,
not

25    taking money for anyone.


        16


1        THE COURT:  Probation officer.

2        (Sidebar discussion held with the probation offi
cer

3        off the record.)

4        (End of sidebar.)

5        THE COURT:  The sentencing findings are as fo
llows:

6    On June 14, Armando Borel Barreiro was found guilty

Borel.Sent.

as to

7       Counts One and Five of the indictment, violations to

8       18 US Code, section 371, 666, and Section 02 pursuant to

9       Guideline Section 3D1.2(d), and 2B1.1, which is nothing

10      else but a loss table.  Counts One and Two were grouped

11      together into a combined base offense level of four.

12              I have this discrepancy, if you will, among the

13      parties as to the loss, and that I have to deal with.  On

14      the one hand, counsel for the defendant suggests that the

15      loss should be 500,000.  Government claims --

16              MS. COLLAZO:  50,000.

17              THE COURT:  50,000.  That zero was -- 50,000.

18              The government, on the other hand, suggests a

19      figure of 695,000.  I would say that both sides make a

20      plausible argument, if you will, for the amount involved,

21      but I have to follow, in this sense, my own instincts in

22      figuring out what the loss is.  That's what I get paid

Page 25

Borel.Sent.

23      for.  And I can tell you that the more I think about it,

24      I am having difficulties to factor in a loss of more than

25      $50,000 in this case, because something tells me that it

17

1       should not be that way.

2               The evaluation that I make of this evidence, of

3       what happened at the trial, those many things that you

4       see that are not necessarily documented that you gauge as

5       things go along, I do think that I should use the $50,000

6       figure.  And if that is so, 50,000, with more than

7       minimal planning, the base offense level must be

8       increased by nine levels, pursuant to Guideline

9       Section 2B1.1(b)(1)(M).

10              PROBATION OFFICER:  Capital H, Your Honor.

11              THE COURT:  Capital H, I'm sorry -- and (b)(4)(A).

12              The presentence report depicts this man as being a

Borel.Sent.

13      minor participant.  There is no objection as to
t.

14      Both parties in agreement as to that adjustment.

15      Therefore, the base offense level is decreased

16      levels, pursuant to Guideline Section 3B1.2(b).

17         The defendant has not earned a reduction
ccount

18      of acceptance of criminal responsibility.  There is
e no

19  ,   other applicable adjustments, so we finish this

20      calculation with a total offense level of 13,
nal

21      History Category of I.  The Guideline Imprisonment
Range

22      would be from 12 to 18 months.  Fine range would be
3,000

23      to 30,000.

24         THE PROBATION OFFICER:  Your Honor, may i app
roach?

25         THE COURT:  Sure.


    18


1       MS. DOMINGUEZ:  I think it would be an 11.

2       THE COURT:  It's seven levels.

3       THE PROBATION OFFICER:  He started at a base


Page 27

Borel.Sent.

4       offense level of four, at seven levels for th

nt of

5       money, two levels for more than minimal p

hat's

6       13.  That's true; it is 13.  I'm sorry, Your Honor.

Yes,

7       it is.

8       .      THE COURT:  Thirteen.  So I was saying that t

he

9       fine range is 3,000 to 30,000.

10      '        Supervised release term of at least two, and

not

11      more than three years.  The guideline imprisonment

range

12      for that level would be, as I said before, 12 to 18

13      months.

14           It is the judgment of this Court that the def

endant

15      is hereby committed to the custody of the Bureau of

16      Prisons to be imprisoned for a term of 12 months an

d one

17      day.

18           Having considered his financial condition, no

fine

19      is imposed.

20           Upon release from confinement, the defendant

shall

21      be placed on supervised release for a term of two y

ears,

Page 28

Borel.Sent.

22     to be served under the following terms and conditio
n:

23     First, he will not commit another federal, state, o
r

24     local crime, and shall observe the standard conditi
ons of

25     supervised release recommended by the US Sentencing

19

1     Commission and adopted by this Court.

2            He will not possess any controlled substances
,

3     firearms, or dangerous weapons.  He will provide th
e

4     probation officer access to any financial informati
on

5     upon request.

6            Restitution-wise, is there any discrepancy ab
out

7     the amount?  How much restitution should be factore
d in

8     this case?

9            MS. WOMAN:  I think if the Court is going to

10    restrict his involvement to the $50,000 transaction
, it

11    should be limited to that.

Borel.Sent.

12          THE COURT:  But Probation Officer, why is it that

13    we have in the recommendation 18,000?  I don't understand

14    that number.

15          THE PROBATION OFFICER:  Let me check, Your Honor.

16          THE COURT:  There must be an explanation for that.

17          MS. WOMAN:  $18,000 would correspond to the three

18    checks that were actually cashed by him but does not

19    contemplate the other four checks that he signed.

20          THE COURT:  Very well.  The defendant shall make

21    restitution in the amount of 18,772.20, to the US

22    Department of Health and Human Services during the first

23    20 months of supervision, as directed by the probation

24    officer, and will notify the US Attorney's Office, as

25    well as the probation officer, of any change of name or

          20

Borel.Sent.

1    address before the full amount has been paid.

2    Restitution payments will be made to the clerk of his

3    court for disbursement to the victim, which is the

4    government.

5        The standard requirement of drug testing, in his

6    case, is waived.

7        Special monetary assessment in the amount of $50

8    dollars for each count of conviction is imposed, for a

9    total of 100.  The defendant is advised that he can

10   appeal the conviction and the sentence if he believes

11   that the sentence or the conviction were unlawfully

12   obtained or imposed.

13       He also has the right to file a notice of appeal

14   within ten days from today.  He has also the right to

15   proceed in forma pauperis, if he cannot satisfy the

16   services of an attorney or the costs on appeal.

17       Anything else at this time, Counsel?

18       MS. COLLAZO:  Nothing further, Your Honor.

19       THE COURT:  Voluntary surrender is going to be

Page 31

Borel.Sent.

20      allowed.

21           MS. WOMAN:  We have no objection to that.  I still

22      get an 11 -- I don't know how -- on the base offense

23      level of four.

24           THE COURT:  It's four; there is a seven increase.

25           THE PROBATION OFFICER:  Minus two was for the role.

21

1       I thought I had done it wrong and I had put acceptance of

2       responsibility.  But the minus two is for the minor role.

3            MS. WOMAN:  What I have is base offense level of

4       four, specific offense characteristic of seven.  More

5       than minimal planning would be 13, plus minor participant

6       was 11.  The Court sentence still falls within that

7       offense level.

8            THE COURT:  It's still 11.  It's still going to

Borel.Sent.

9      be -- the range is eight to 14.  That is why we be
amc

10     lawyers, because we can't add.

11         Anything else at this time?

12         MS. WOMAN:  Nothing from the government, than
k you,

13     sir.

14         THE COURT:  You're now excused.

15         What else do we have for the afternoon.?

16         THE CLERK:  Yes, and a status conference.

17         MS. COLLAZO:  I'm sorry.  It's been a difficu
lt

18     day.  We respectfully request from Your Honor a vol
untary

19     surrender.

20         THE COURT:  I already granted it.

21         MS. COLLAZO:  I'm sorry.

22         THE COURT:  Thank you very much.

23         You're now excused.

24         THE COURT:  Let's take a brief recess.

25         (End of proceeding)

22

1



Borel.Sent.

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Borel.Sent.

25

23

1

2                    C E R T I F I C A T I O N

3

4        I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9    _____    _____
10   Signature of Court Reporter          Date

11

12

13

14

15

16

17

18

Page 35